(No. 71135.—

AMERICAN NATIONAL BANK & TRUST COMPANY OF CHICAGO, as Adm'r of the Estate of Raymond Lukas, Sr., Deceased, and as Guardian of the Estate of Raymond John Lukas, Jr., Appellee, v. NATIONAL ADVERTISING COMPANY *et al.* (National Advertising Company, Appellant).

*Opinion filed May 21, 1992.—Rehearing denied June 25, 1992.*

BILANDIC, J., joined by FREEMAN, J., concurring in part and dissenting in part.

Henry C. Szesny and Charles E. Joern, Jr., of Pope, Ballard, Shepard & Fowle, Ltd., of Chicago, for appellant.

John A. Doyle, of Doyle & Ryan, Ltd., of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellee.

JUSTICE MORAN delivered the opinion of the court:

In a wrongful death action, plaintiff, American National Bank and Trust Company of Chicago (Bank), as administrator of the estate of decedent Raymond Lukas, Sr. (Lukas), sought to recover damages from various defendants on behalf of Lukas' minor son. Two of the six counts in the Bank's second-amended complaint were directed against National Advertising Company (National). Count IV alleged violation of the Structural Work Act (the Act) (Ill. Rev. Stat. 1981, ch. 48, par. 60 *et seq.*), and count VI was based on negligence. The circuit court of Cook County granted summary judgment in favor of National on both counts. The appellate court reversed and remanded (205 Ill. App. 3d 348), and this court granted National's petition for leave to appeal (134 Ill. 2d R. 315).

We are asked to determine whether summary judgment was properly granted on counts IV and VI of the Bank's complaint. For the reasons below, we reverse the appellate court's denial of summary judgment for National on count IV (violation of the Act), and affirm its finding that the trial court should reinstate count VI (negligence).

Lukas was electrocuted while painting a billboard (sign) leased to National, which had contracted with Lukas' employer for the painting. The sign, located near Interstate 55 in Will County, was approximately 26 feet high by 60 feet wide, and was oriented in a north-south

direction. A walkrail, consisting of two-by-six boards nailed to the structure, ran the length of the sign's back approximately two feet down from its top. A high-voltage power line ran overhead 24 to 30 inches from the top of the sign, crossing it at right angles approximately eight inches inward from the sign's north end.

On the day of the accident, Lukas and his co-worker Jeffrey Skoumal (Skoumal) set up aluminum staging along 20 feet of the sign's front side. The staging was supported by four grappling hooks attached to the top of the sign. In order to position one of the hooks $3\frac{1}{2}$ feet from the north end of the sign, Skoumal placed a wooden extension ladder against the signface at its north end, extending the ladder to reach to approximately two feet from the sign's top, and then walked along the walkrail to position the other hooks. After Lukas and Skoumal had finished painting the lettering in the middle of the sign, Lukas went up the ladder to remove the grappling hooks for a section of the staging. In order to reach the hooks, Lukas had to step from the ladder over the top of the billboard, and then step onto the walkrail on the back side of the sign. Skoumal last saw the decedent when Lukas was coming back towards the ladder along the walkrail from the south end of the sign. Skoumal continued to paint until he felt a slight shock, turned, and saw Lukas falling. Skoumal did not see decedent come into contact with the power line, and there were no other witnesses to the accident. Skoumal testified that he had never seen the power line, either on that day or 15 months earlier, when he and decedent had touched up the lower left-hand of the sign.

The parties agree that Lukas' death was caused by his contact with the power line. The coroner's inquest established that the electricity entered decedent's body through his forehead, and exited through his left hand and left leg. Burn marks from decedent's hands were

found near the top of the sign face, directly underneath the power line. Workers subsequently discovered wisps of decedent's hair on the high-tension wire, and burn marks on the ladder.

National has submitted a motion asking that the court strike or disregard portions of plaintiff's brief and argument which are based on statements made by Skoumal in a notarized affidavit and in an unwitnessed summary made by his attorney. Because the summary was unsworn and consists of inadmissible hearsay, and because both documents contain conclusions based on speculation rather than firsthand knowledge, we disregard both documents and all reference made to them by plaintiff.

## I

## Count IV: Structural Work Act

In count IV of its complaint, the Bank contended that National violated the Act by, *inter alia*, failing to provide safe scaffolds and supports. National argued that the Act does not contemplate risks of injuries due to workers' contact with power lines. The trial court granted summary judgment on count IV in National's favor, relying on a line of appellate court cases which have held that the Act does not encompass the hazards of high-voltage electrical wires. (*O'Rourke v. Oehler* (1989), 187 Ill. App. 3d 572 (painter electrocuted when his aluminum ladder came into contact with electrical wires); *Overbeck v. Jon Construction, Inc.* (1989), 184 Ill. App. 3d 918 (electrician thrown off ladder due to explosion caused by contact with "hot" wire); *Barrera v. Windy City Exteriors, Inc.* (1989), 182 Ill. App. 3d 936 (worker on scaffold electrocuted when aluminum siding he was installing came into contact with power line); *Smyrniotis v. Brockob Construction Co.* (1986), 142 Ill. App. 3d 340 (worker installing flashing on roof contacted

overhead power lines); *Kochan v. Commonwealth Edison Co.* (1984), 123 Ill. App. 3d 844 (electrician on ladder injured through contact with electrical wires).) However, the appellate court in the present case was not persuaded by the reasoning in the cases cited, relying instead upon *Brazier v. Kontos* (1987), 160 Ill. App. 3d 177, and *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, in reaching its decision to reverse summary judgment on count IV.

In *Burke*, the plaintiff was severely injured when a steel pipe being lifted by the crane he was directing came into contact with a power line which sent a surge of electricity down the pipe and through his body. (*Burke*, 57 Ill. App. 3d 498.) The structural device at issue became a conduit for the electricity, rather than, as in the other appellate court cases, a support by means of which the injured worker made contact with an electric line. Evidence was also brought out in *Burke* that installation of a safety device on the crane could have prevented the accident. Although the *Burke* court stated broadly that the purpose of the Act is to provide a safe area in which persons covered by the Act will be working (*Burke*, 57 Ill. App. 3d at 509), the court's primary concern was not with the scope of the Act, but rather with the defendant's liability.

In *Brazier*, the plaintiff's decedent was electrocuted while descending a hydraulic ladder attached to a truck parked between a power line and the sign on which decedent was working. (*Brazier*, 160 Ill. App. 3d at 180.) Although the *Brazier* court mentioned the defendant's argument that decedent's injuries were caused by contact with electrical wires and not by failure of the support device, the court did not address the specific issue that was raised, and did not refer to the line of appellate court cases which dealt with the question of applicability of the Act to injuries caused by electricity. Rather, to support its conclusion that the Act is violated where ladders are not erected in a safe manner and are not placed and operated

so as to give proper protection to construction workers, the court cited *Smith v. Georgia Pacific Corp.* (1980), 86 Ill. App. 3d 570. *Smith*, however, concerned a claim for injuries sustained by a painter who fell from a ladder which he had tried to move while still standing on it. The *Smith* court found that whether the ladder was placed on a safe base and whether it was properly braced were questions for the jury under the Structural Work Act. The painter in *Smith* did not come into contact with electricity, and the court did not consider the hazards of electricity in relation to the Act. Thus, neither *Brazier, Burke,* nor their supporting cases persuade us that the danger of electricity must be considered among the hazards envisaged by the Act.

The Bank contends that improper placement of the ladder gave rise to a cause of action under the Act because the ladder's placement in close proximity to the power line caused decedent to come into contact with the wire which caused his death. National urges that, because the Bank did not raise the issue of improper placement of the ladder in its pleadings or in its appellate court briefs, the issue has been waived. However, in count IV, paragraph 11(d), of its second-amended complaint, the Bank alleged that National:

> "[f]ailed to supply adequate ladders or staging, in lieu of scaffolding erected in a safe, suitable and proper manner and *placed and operated so as to give proper and adequate protection to the life and limb of any person engaged on said structure being used as a stay or support."* (Emphasis added.)

Thus, we find the Bank's pleadings to be sufficient in raising the issue of the ladder's placement. Moreover, an appellee may defend a judgment on review by raising an issue not previously ruled upon by the trial court if the necessary factual basis for the determination was contained in the record. (*Kravis v. Smith Marine, Inc.* (1975),

60 Ill. 2d 141.) For these reasons, we consider that the Bank did not waive the issue of placement.

However, National argues that the Act contemplates coverage for accidents arising from improper placement of a ladder only when such placement results in the ladder's providing inadequate support. Thus, according to National's argument, if a wobbly ladder caused a worker to fall onto a power line, the Act might provide coverage, but where, as in this case, the ladder remained stable, it does not. Consequently, National contends that the circuit court properly granted summary judgment in its favor on count IV.

Summary judgment is appropriate where the pleadings, depositions and affidavits show that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1981, ch. 110, par. 2—1005(c); *Vuletich v. United States Steel Corp.* (1987), 117 Ill. 2d 417, 421.) Such judgment is proper when the parties agree upon the facts, but dispute the correct construction of the Act and whether the facts sustain a cause of action. (*Kochan*, 123 Ill. App. 3d at 848.) Whether the Act covers injuries caused by contact with a power line is a matter of statutory construction and therefore a question of law for the court to determine. *Vuletich*, 117 Ill. 2d at 421.

This court has previously interpreted the Act, and has determined: (1) whether the structural device concerned was a "support" within the Act (*Lafata v. Village of Lisle* (1990), 137 Ill. 2d 347; *Vuletich*, 117 Ill. 2d 417; *Tenenbaum v. City of Chicago* (1975), 60 Ill. 2d 363); (2) whether the Act contemplated the use to which a structural device was put (*Innis v. Elmhurst Dodge, Inc.* (1985), 107 Ill. 2d 151); and (3) whether the work activity involved was within the required employment classification (*Halberstadt v. Harris Trust & Savings Bank* (1973), 55 Ill. 2d 121). However, the question of whether coverage under the Act

extends to improper placement of a structural device which, although providing adequate support, brings the worker into dangerous proximity with a power line is one of first impression for this court.

The Act states in relevant part:

"All scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be so erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon." Ill. Rev. Stat. 1981, ch. 48, par. 60.

It is undisputed that the ladder, walkrail, and staging used by Lukas constitute support devices within the purview of the Act. Nor is there any doubt that the Act is concerned with the proper construction and placement of those devices. However, a careful reading of the Act fails to answer the essential question of whether the proper placement of a device is meant to ensure only that it provides proper support, or whether the Act also mandates placement in a location where the worker will be free from ambient hazards.

Since a statute is passed as a whole, and animated by one general purpose, each part should be construed with every other part so as to produce a harmonious whole. (2A N. Singer, Sutherland on Statutory Construction §46.05 (Sands 4th ed. 1984).) Subsequent sections of the Act address the manner in which adequate support should be provided, e.g., by limiting loads on a structure. The required protective measures are directed towards preventing hazards such as those of workers falling from a struc-

ture or being struck or crushed by materials due to insufficient support. There is no mention of potential injuries due to other causes. Thus, we can find no specific support in any part of the Act for plaintiff's contention that it was intended to provide protection from electrical hazards.

Legislative intent should be determined from the language used in the statute and from the evil to be remedied and the object obtained by the provision. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 317.) Thus, having examined the wording of the Act, we look next to the reasons for its enactment.

The appellate court has traced the history of the Act in order to determine its purpose. (See *Rayfield v. Homart Development Co.* (1981), 100 Ill. App. 3d 620.) In 1907, when the Act was promulgated, Illinois did not yet have a workers' compensation act. Construction workers who were injured due to their ultrahazardous working conditions.were often unable to succeed in their claims for damages because of the doctrines of contributory negligence and assumption of risk.

> "The purpose of the Structural Work Act 'was to prevent injuries to persons employed in this dangerous and extra- hazardous occupation, so that negligence on their part in the manner of doing their work might not prove fatal.' (*Schultz v. Henry Ericsson Co.* (1914), 264 Ill. 156, 164, 106 N.E. 236, 239.) As a result, the doctrines of contributory negligence and assumption of risk were held not to be applicable to the Act." *Rayfield,* 100 Ill. App. 3d at 622.

In *Meyer v. Caterpillar Tractor Co.* (1990), 135 Ill. 2d 1, this court adopted the reasoning of *Rayfield,* concluding that the intention of the Act was to provide injured workers in the construction trades a remedy where none existed, rather than to provide an additional remedy where other reasonable and satisfactory remedies were available. Although the Act should be liberally interpreted when nec-

essary to afford relief to injured workers, it should not be " 'extended unnecessarily to cover neoteric theories of liability where the existing workmen's compensation and tort remedies protect and give reasonable and satisfactory relief to construction workers.' " (*Meyer*, 135 Ill. 2d at 16, quoting *Rayfield*, 100 Ill. App. 3d at 622-23.) Thus, although this court has reiterated that the Act should be given a liberal interpretation in order to achieve its purpose of protecting persons in extrahazardous occupations, it has repeatedly refused to interpret the Act to cover any and all construction activities. *Innis*, 107 Ill. 2d at 155.

This court has previously stated that "[i]t is only when an injury has some connection with the hazardous nature of one of the devices named in section 1 of the Act that a cause of action may be maintained under that section of the Act." (*Tenenbaum*, 60 Ill. 2d at 371.) Because we interpret the purpose of the Structural Work Act to be that of ensuring stable support to the structural worker and of providing him with a remedy when no other remedy is available, we hold that the Act has no application to this case. Thus, we reverse the judgment of the appellate court on count IV.

## II
## Count VI: Negligence

In order to prevail in an action for negligence, the plaintiff must prove that the defendant owed a duty, that defendant breached that duty, and that defendant's breach was the proximate cause of injury to the plaintiff. (*Deibert v. Bauer Brothers Construction Co.* (1990), 141 Ill. 2d 430, 434.) In count VI of its second-amended complaint, the Bank alleged that National, lessee of the sign in question, breached its duty of care by, *inter alia*, placing the walkrail in dangerous proximity to high-voltage electrical wires, failing to demand insulation and relocation of the

wires, and failing to warn of the danger of contacting the wires, thus proximately causing decedent's death. Defendant responded that, as the high-voltage wires were an open and obvious danger, National had no duty to warn of their presence.

Unless a duty is owed, there is no negligence. (*Dunn v. Baltimore & Ohio R.R. Co.* (1989), 127 Ill. 2d 350, 365.) Whether a duty exists is a question of law for the court to decide. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 140.) Among the factors which this court has considered relevant to the existence of a duty are reasonable foreseeability, the likelihood of injury, and the extent of the burden placed upon the defendant in guarding against an injury. *Ward*, 136 Ill. 2d at 140-41.

It is undisputed that National was the lessee of the land on which the billboard stood, and was responsible for the sign's maintenance. In *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, this court adopted section 343 of the Restatement (Second) of Torts, which provides:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger." (Restatement (Second) of Torts §343 (1965).)

Comment *a* of the Reporter's Notes to section 343 observes that section 343 should be read together with section 343A, which limits the liability stated above. Section 343A states in pertinent part:

"(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them,

unless the possessor should anticipate the harm despite such knowledge or obviousness." Restatement (Second) of Torts §343A (1965).

Contrary to National's allegations, the Bank does not concede that the danger of the power line was open and obvious. Both through depositions and in its answer to defendant's petition for leave to appeal to this court, the Bank presented testimony by individuals who had worked on the sign that they were unaware of the power line's presence. Such testimony presents a question of fact as to whether or not the danger was open and obvious. However, the Bank contends that, even if the danger were open and obvious, National should have foreseen the harm caused to decedent. Further, the Bank cites comment $f$ of the Reporter's Notes to section 343A, which states:

"There are *** cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection. This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm.

Such reason to expect harm to the visitor from known or obvious dangers may arise, for example, where the possessor has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it." Restatement (Second) of Torts §343A, Comment $f$ (1965).

The parties agree that decedent came into contact with the electrical wire as he was transferring from the walkrail to the ladder. Photographs of the accident site reveal that, at least in the light and from the angle at

which the photographs were taken, the wire is clearly visible. Thus the danger was arguably open and obvious.

National cites *Genaust*, 62 Ill. 2d 456, in arguing that a landowner has no duty to warn of such an open and obvious danger. However, *Genaust* is distinguishable on its facts. In *Genaust*, plaintiff was installing a metal tower and antenna on the roof of defendant's premises when electricity from a neighboring power line arced to the antenna and injured plaintiff. In finding that defendant was not liable, this court took into consideration that the landlord could not have discovered the danger of electricity arcing from power lines *"which were neither on its property nor under its control."* (Emphasis in original.) (*Genaust*, 62 Ill. 2d at 468.) Further, the court found that an employer would expect a worker with expertise in installing antennae to be reasonably aware of the hazards of installing metal equipment near power lines.

Subsequent to *Genaust*, this court considered two other cases in which the plaintiff was injured when he encountered an open and obvious hazard. In *Ward*, 136 Ill. 2d 132, plaintiff collided with a post as he exited the defendant's store carrying a large mirror. Although the plaintiff conceded that he had probably seen the post when entering the store, the court relied upon comment *f* of the Reporter's Notes to section 343A in finding that the owner nonetheless had a duty of care because the injury was reasonably foreseeable. In *Deibert*, 141 Ill. 2d 430, a construction worker stepped out of a portable toilet and stumbled into a rut after looking up to watch for falling debris. Guided once again by comment *f*, the court found that the defendant contractor should have anticipated that the worker's attention might be distracted. As the court observed, the accident was foreseeable because the plaintiff could not look both down and up at the same time. (*Deibert*, 141 Ill. 2d at 439.) In the

present case, it could be foreseen that a worker would have to watch his footing when stepping from the walkrail over the sign to the ladder. He could not simultaneously look down at his feet and up at the overhead power line.

" 'Foreseeability means that which it is *objectively reasonable* to expect, not merely what might conceivably occur.' " (Emphasis in original.) (*Genaust*, 62 Ill. 2d at 466, quoting *Winnett v. Winnett* (1974), 57 Ill. 2d 7, 12-13.) Since the purpose of the walkrail was to allow workers to walk the full length of the sign in order to make repairs, it was objectively reasonable to expect that a worker could come into contact with a power line that hung only 4½ to 5 feet above the walkrail. It was also reasonable to expect that a worker might be distracted by having to watch where to place his feet, and consequently would not be aware of or remember the presence of the electric wires. Thus, defendant had reason to anticipate an injury such as the one which occurred.

Further, the burden on defendant to protect workers against the hazardous power line would not have been heavy. National might have shortened the walkrail so that it no longer ran under the power line. Alternatively, National might have demanded that the utility company relocate the power line. At very little expense or inconvenience, National might have warned workers of the hazard. For the above reasons, we find that National owed a duty of reasonable care to the decedent.

Whether a defendant has breached its duty is a question of fact. (*Deibert*, 141 Ill. 2d at 441.) If the jury finds that National failed to exercise reasonable care, it must then determine whether that failure was the proximate cause of decedent's death.

As this court stated in *Ward* and repeated in *Deibert*, "[w]hether in fact the condition itself served as adequate notice of its presence or whether additional precautions

were required to satisfy the defendant's duty are questions properly left to the trier of fact." (*Ward*, 136 Ill. 2d at 156; *Deibert*, 141 Ill. 2d at 441.) The record reveals that some workers on the sign had not noticed the overhanging wires; there is also testimony from one worker that he had seen the wires and was aware of the danger they represented. The trier of fact must evaluate all the evidence. The jury must also determine whether National took any safety precautions, and, if so, whether the measures were adequate to satisfy its duty of reasonable care. If the jury finds defendant National liable, it must then decide whether and to what degree Lukas was also negligent. In evaluating Lukas' possible negligence, the jury can take into account the decedent's experience as a sign painter, and whether the use of ordinary care would have caused him to avoid the accident.

For the reasons stated, we reverse the appellate court judgment as to its reversal of the circuit court's summary judgment on count IV, and affirm the appellate court judgment as to its reversal of the circuit court's summary judgment on court VI. Accordingly, the judgment of the circuit court is affirmed in part and reversed in part, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

*Appellate court affirmed in part*
*and reversed in part;*
*circuit court affirmed in part*
*and reversed in part;*
*cause remanded.*

JUSTICE BILANDIC, concurring in part and dissenting in part:

I concur with that portion of the majority opinion which holds that the plaintiff's complaint properly stated a cause of action for negligence. I respectfully dissent, however, from that portion of the opinion

which holds that the plaintiff does not have a cause of action under the Structural Work Act (Ill. Rev. Stat. 1989, ch. 48, par. 60 *et seq.*).

The question presented is one of statutory construction. In construing a statute, our duty is to ascertain and give effect to the intent of the legislature. (*City of Springfield v. Board of Election Commissioners* (1985), 105 Ill. 2d 336, 340-41.) That inquiry properly begins with the language of the statute. (*First National Bank v. Mutual Trust Life Insurance Co.* (1988), 122 Ill. 2d 116, 121.) Section 1 of the Structural Work Act states in relevant part:

> "All scaffolds *** ladders, supports, or other mechanical contrivances, erected or constructed *** for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be so erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such a manner as to prevent the falling of any material that may be used or deposited thereon." (Ill. Rev. Stat. 1989, ch. 48, par. 60.)

It is undisputed that the plaintiff's decedent used the ladder and walk rail at issue here to perform an activity (painting) protected under the Act. In addition, the majority concedes that the Act requires proper placement of such structural devices. Thus, the only question for our review is whether the plaintiff's complaint adequately alleged that the defendants breached their statutory duty to properly place the structural devices. The language of section 1 unequivocally creates a broad duty with regard to placement of structural devices. That section mandates that a structural device, such as the ladder and walk rail at issue here, shall be

so *"placed \*\*\* as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon."* (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 48, par. 60.) The plaintiff's allegation that the ladder or walk rail were improperly placed so close to a power line that the decedent was thereby electrocuted certainly falls within the language of the Act.

The majority holds, however, that the Act has no application in this case. The majority rewrites the Act, under the guise of construing it, and holds that the statute only requires that a structural device be placed in a manner which "ensures stable support" to structural workers. The majority offers two rationales in support of its novel interpretation of the statute. First, the court determines that the Act was intended to prevent workers and materials from falling off of inadequate structural devices. Second, the court suggests that the Act should not be interpreted to apply in circumstances where the plaintiff may have another remedy.

Neither the language nor the history of the Act supports the narrow construction which the majority adopts. Nothing in the language of section 1 suggests that the duty to properly place a structural device is satisfied if the device offers adequate support to structural workers. On the contrary, the language of the statute unequivocally states that all structural devices shall be placed *as to give proper and adequate protection to the life and limb of any person engaged thereon.* If the legislature simply intended to prevent workers and materials from falling from improperly placed structural devices, it could have clarified the statute by inserting specific language to that effect. In fact, a close reading of other sections of the statute reveals that, when the legislature's purpose was to pro-

tect workers and materials from falling, it inserted specific language stating that purpose. (See, *e.g.*, Ill. Rev. Stat. 1989, ch. 48, par. 60 (requiring structural devices to be erected, constructed, placed and operated "in such manner as *to prevent the falling of any material* that may be used or deposited thereon" (emphasis added)); Ill. Rev. Stat. 1989, ch. 48, par. 64 (requiring a secondary support device underneath a working scaffold *"for the purpose of preventing the person or persons performing such labor, from falling* in case of any accident to such working scaffold" (emphasis added)).) No such limiting language is found in the portion of the statute at issue here. Instead, the broad language of the statute reflects the legislature's intent to extend maximum protection to structural workers. The risk that a worker will fall from an improperly placed structural device is only one of the many risks that the legislature intended to address when it drafted section 1.

The majority opinion also conflicts with the purpose of the Structural Work Act. The primary purpose of the Act is to encourage safe construction practices so as to prevent injury to persons employed in hazardous occupations. (*Harvel v. City of Johnston City* (1992), 146 Ill. 2d 277, 284; *Halberstadt v. Harris Trust & Savings Bank* (1973), 55 Ill. 2d 121, 127.) The legislature recognized that structural workers, who are generally the victims of safety violations, are often in the poorest position to provide for their own safety. Workers often lack the knowledge and/or time to appreciate all of the dangers which confront them at a construction site. In addition, workers may be unaware of measures which might be taken to enhance their safety. Even in circumstances where workers recognize a dangerous condition at a work site, they generally lack the authority to reduce or eliminate the danger. Workers

frequently have no choice but to accept employment upon such terms as are offered.

The Structural Work Act was enacted to encourage those in charge of structural work to implement safe construction practices and to prevent accidents before they occur. Our courts have liberally construed the Act so as to effectuate this preventative purpose. (See *Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444.) The remedial provisions of the Act carry out the legislature's strategy of reducing hazards at the work site. Because persons having charge of structural work bear the burden of fully compensating injured workers, the Act encourages them to take active measures to enhance safety at the work site.

The majority's interpretation of the Act undermines the legislature's intent to encourage active measures to enhance safety so as to prevent injuries to structural workers. Under the majority opinion, persons responsible for construction activities are no longer liable for injuries that workers suffer because of an improperly placed structural device. As a result, they no longer have an incentive to insure that structural devices are placed in a safe area. According to the majority, the Act is satisfied as long as a device is structurally sound and stable, even if it is placed in an area which exposes workers to danger. Now, scaffolds used in repairing a viaduct may be improperly placed in an area where workers are in danger of being struck by oncoming traffic. Scaffolds used in the construction of a building may be improperly placed in an area where workers are in danger of being struck by objects falling or intentionally discarded from above. Indeed, those having charge of structural work may now erect scaffolds only inches away from high-voltage power lines without fear of liability for injuries which foreseeably result.

The majority suggests that the Act should not apply because an injured worker may have another remedy. The court then goes on to discuss whether the plaintiff is precluded from bringing a common law negligence action because the power lines were an "open and obvious" danger. Although the majority upholds the plaintiff's negligence claim here, there undoubtedly will be future cases where plaintiffs will be barred from bringing a common law negligence claim because the improperly placed scaffold exposed them to an "open and obvious" danger. The majority's analysis simply illustrates the problem which the legislature sought to remedy when it enacted the Structural Work Act. When a structural device is improperly placed in an unsafe area, workers frequently have no choice but to use the device despite the danger. Even if workers recognize that the placement of a device exposes them to an "open and obvious" danger, they generally are not in a position to insist that the device be moved for their protection. The legislature recognized this dilemma and enacted the Structural Work Act to remedy the problem. The Act is intended to encourage persons "in charge" of a work site to place scaffolds in a safe area by holding them liable for injuries suffered as a result of improperly placed structural devices. Because the majority has completely thwarted the legislature's intent to encourage safe working conditions, I dissent.

JUSTICE FREEMAN joins in this partial concurrence and partial dissent.